In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00112-CR


______________________________




TIMOTHY O. PASLAY, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 5th Judicial District Court


Bowie County, Texas


Trial Court No. 01F0281-005




 




Before Ross, Cornelius* and Grant,** JJ.


Opinion by Justice Cornelius


*William J. Cornelius, C.J., Retired, Sitting by Assignment


**Ben Z. Grant, J., Retired, Sitting by Assignment



O P I N I O N



 Timothy O. Paslay appeals his conviction for failure to stop and render aid, a third
degree felony. See Tex. Pen. Code Ann. § 12.34 (Vernon 2003); Tex. Transp. Code Ann.
§ 550.021 (Vernon 1999). This case was tried simultaneously with a separate charge for
manslaughter after the State moved, without Paslay's objection, for the consolidation of the
trials. The jury found Paslay guilty in each case and sentenced him to five years'
imprisonment for each offense. The sentences were ordered to run concurrently. He
appealed the convictions separately, but the parties combined the cases for purposes of
briefing and oral argument. We address each appeal by way of separate opinion. (1)

 Paslay presents two issues on the appeal of this case: first, he asserts that,
because the evidence is legally insufficient to support the conviction for manslaughter, he
was unfairly prejudiced in the punishment phase of this case by the evidence presented
on the manslaughter charge; second, he contends the trial court erred by admitting
evidence of a two-year-old unadjudicated domestic violence occurrence. For the reasons
stated below, we affirm the trial court's judgment.

 In his first issue, Paslay contends that, because the evidence to support his
manslaughter conviction is legally insufficient, the impact of the evidence supporting the
manslaughter conviction prejudiced the punishment phase of his trial in this case. In a
separate opinion issued today, we find the evidence legally sufficient to support Paslay's
conviction for manslaughter. See Paslay v. State, No. 06-02-00113-CR (Tex.
App.-Texarkana Aug. 7, 2003, no pet. h.) (not designated for publication). Accordingly,
we find that the jury's consideration of the evidence related to the manslaughter charge did
not unfairly prejudice the jury's decision on punishment in this case.

 Moreover, we conclude that Paslay has waived this issue. A month before trial, the
State gave notice of its intent to consolidate Paslay's manslaughter and failure to stop and
render aid cases for trial. See Tex. Pen. Code Ann. § 3.02 (Vernon 2003) (consolidation
and joinder of prosecutions). Paslay not only failed to object to the consolidation but, in
fact, joined in support of the State's motion, even though Paslay had the statutory right to
have the cases severed. See Tex. Pen. Code Ann. § 3.04 (Vernon 2003) (defendant's right
to severance); Wedlow v. State, 807 S.W.2d 847, 850-51 (Tex. App.-Dallas), pet. ref'd, 
814 S.W.2d 750 (Tex. Crim. App. 1991) (per curiam) (discussing defendant's right to
severance). A defendant waives his right to severance when he either joins or fails to
object to the State's notice of consolidation. Milligan v. State, 764 S.W.2d 802, 803 (Tex.
Crim. App. 1989). 

 The consolidation or severance of charges involves tactical decisions for both
defendants and the State. When cases are consolidated, a defendant generally avoids the
potential for cumulative sentences. See Tex. Pen. Code Ann. § 3.03 (Vernon 2003)
(except for specific offenses, sentences for offenses arising out of same criminal episode
must run concurrently). This benefit, however, comes at a price. If a defendant is found
guilty of one or both crimes, the jury will likely take into account evidence for both cases
in determining punishment. By choosing severance, a defendant may also improve the
chances of an acquittal by defending against only one charge at a time. Haight v. State,
103 S.W.3d 498, 505 (Tex. App.-San Antonio 2003, pet. filed). A defendant further avoids
both the danger that the jury might label the defendant as a bad person deserving of
punishment because of the other offenses he has committed and the risk that the jury will
infer that the defendant committed the offense charged because he also committed the
other offenses. Llamas v. State, 12 S.W.3d 469, 471-72 (Tex. Crim. App. 2000)
(referencing 2 Wayne R. LaFave, Israel & King, Criminal Procedure Criminal Practice
Series, 17.1(d) (2nd ed. Supp. 1999)). 

 In this case, Paslay joined the State in urging the trial court to consolidate the cases
for trial. In so doing, he most assuredly was aware that the jury might consider evidence
from the manslaughter charge in determining its punishment recommendation for Paslay's
failure to stop and render aid. Implied in his decision to urge consolidation is the belief that
the potential consequence of a greater sentence on either or both cases was offset by the
benefit of avoiding consecutive sentences. A defendant who strategically elects to have
cases consolidated waives the right to complain on appeal about any alleged prejudicial
effect that evidence from one case may have on the punishment outcome in the other case
when the evidence to support each conviction is sufficient. See Milligan v. State, 764
S.W.2d at 803. We overrule Paslay's first issue.

 In his second issue, Paslay contends the trial court erroneously admitted evidence
of a two-year-old unadjudicated domestic violence occurrence. We review the trial court's
decision to admit or exclude evidence for abuse of discretion. Salazar v. State, 38 S.W.3d
141, 153-54 (Tex. Crim. App.), cert. denied, 534 U.S. 855 (2001).

 During the trial on punishment, Texarkana Police Officer Gerald Palmore testified
that he talked to Jennifer Paslay on January 6, 1998. Jennifer came into the police
department to report being assaulted by her husband, the appellant, Timothy Paslay. 
Palmore stated Jennifer had visible bruises on her right cheek and a swollen area around
her right eye. The State also offered into evidence two pictures taken of the victim's
injuries on January 6, 1998. Paslay did not object to the pictures or to any portion of
Palmore's testimony. To preserve for appellate review an objection to the admission of
evidence, a defendant must first make a specific objection before the trial court. Tex. R.
App. P. 33.1; Robinson v. State, 85 S.W.3d 338, 341 (Tex. App.-Texarkana 2002, pet.
ref'd). Paslay's failure to object waived this issue for our review. We overrule Paslay's
second issue.


 The trial court's judgment is affirmed.


 William J. Cornelius*

 Justice



*Chief Justice, Retired, Sitting By Assignment 


Date Submitted: July 10, 2003

Date Decided: August 7, 2003


Do Not Publish
1. For our opinion in the manslaughter case, see Paslay v. State, No. 06-02-00113-CR (Tex. App.-Texarkana Aug. 7, 2003, no pet. h.) (not designated for publication).



 himself and he almost fell off the couch. [Allison] just sat
and watched a movie that she put in. There was really no interaction between her and
her children. She had an attitude the whole time. She kept yelling at . . . Summer's
son, throughout the whole visit. 


 . . . . 


 She was telling him to shut up and just really aggressive with
him . . . throughout the visit, she kept telling [T.J.A.] that he is bad throughout the
time of that visit. And then [T.J.A.] hit [K.L.L.H.] in the head, she didn't correct the
behavior. And then throughout the visit, too, [K.L.L.H.] had asked where his mama
was, which I thought was kind of disturbing, and [Allison] said, "I'm your mama." 
And he asked again where his mama was. 


Eisenring recalled that "[t]here wasn't a real bond from what I observed in that visit." Although she
was scheduled for a counseling session, Allison was unable to attend because she was arrested and
incarcerated on September 28, 2008, for aggravated assault charges. (2) No other task or service in the
agreed plan was completed by Allison. 

 On January 16, 2009, Eisenring visited with Allison in jail. Allison acted angry and hostile,
"kept making fists, and charging the glass as to intimidate . . . and was not willing to work with the
caseworker." She "stated she didn't want a court appointed attorney even though the caseworker
told her about one." Allison told Eisenring that "court attorneys are a joke and [she] would be
getting one when she got out." Allison refused to cooperate with Eisenring's attempt to help her
request a court-appointed attorney. 

 Once again and still incarcerated, Allison failed to appear at the permanency hearing held on
February 25, 2009. DFPS stated, "Ms. Eisenring went to the jail last week . . . and . . . was trying
to suggest that [Allison] get a lawyer, and she cursed at the thought that she would take a court-appointed lawyer in this case." At the hearing, a DFPS employee reported that Allison had not
completed any task or service due to her incarceration, and it was found that she had not
demonstrated adequate and appropriate compliance with the service plan. 

 Despite the fact that Allison never filed a declaration of indigence, on May 27, 2009, the trial
court appointed Mike Lewis as her attorney ad litem and scheduled trial on June 22, 2009. Allison
appeared through Lewis at a June 2, 2009, permanency hearing where the court again found she was
not complying with the service plan. The trial court made the following notation: "We -- for the
record, I believe we tried to have [Allison] brought down one day last week to see if she -- to get on
the record whether she wanted to have an attorney -- I think she had indicated to the caseworker she
didn't." The court instructed Lewis to let it know if Allison refused his help. On June 12, 2009,
Allison signed a letter addressed to the court on Lewis' letterhead stating, "I, Tamera Allison do not
wish to have appointed representation in Cause No. 2008-1809-DR. I understand that this does not
prevent me from representing myself." Allison appeared via telephone at trial. She immediately told
the trial court that although she signed the letter indicating she wanted to represent herself, she had
changed her mind almost at once thereafter and that she wanted Lewis to represent her. Lewis was
summoned, and the trial resumed. 

 Professional counselor Donna Mason testified that K.L.L.H. exhibited aggressive behavior
apparently learned from adults, including hitting, crying, screaming, and saying, "I don't care, I'm
going to kill you." K.L.L.H. had stated that while Danterio was watching him, he "hit me with a
belt, he hit me on my butt and on my wee wee." For the majority of his life, K.L.L.H., "lived and
he stayed with [his paternal grandmother] at least two or three weeks at a time," and would then
return to his mother's apartment. K.L.L.H.'s aggressive behavior had significantly improved since
he was left in his paternal grandmother's care, and he had received the twenty-two immunization
shots he had missed while in Allison's custody. 

 Next, Eisenring reported that T.J.A. had folliculitis sores on his head while under the watch
of Allison that would cause his scalp to bleed; Allison had refused to cut the thirteen-month-old's
braided hair. T.J.A. was also developmentally deficient. He could not speak, hold a spoon, eat from
a plate, was not walking, and had "horrible" sleeping patterns which resulted in him banging his head
against the pillow for hours. These problems, along with his aggressive behavior and lack of proper
immunizations, were remedied when placed in a foster home. Eisenring told the court that Summer,
who was often left to care for the children, was now incarcerated for injuring her own child by hitting
him in the face with a belt and buckle. 

 At the conclusion of the testimony, the trial court found, by clear and convincing evidence,
that Allison failed to comply with court orders and service plans and that the children were
physically or emotionally endangered while in Allison's care. Allison's parental rights to T.J.A. and
K.L.L.H. were terminated. 

III. Allison Waived the Argument that Section 107.013 Is Unconstitutional 

 Allison raises the following point of error: "Section 107.013(a)(1), (c) is unconstitutional
as applied to Allison because it does not specify a time by which counsel must be appointed;
therefore, it operated to deprive her of due process right to counsel and fair trial." Judicial economy
requires that a trial court have the opportunity to correct an error before an appeal proceeds. 
In re C.O.S., 988 S.W.2d 760, 765 (Tex. 1999). To preserve error for appellate review, Allison was
required to make a timely objection specifying the grounds for the objection at the earliest
opportunity and obtain an adverse ruling from the trial court. See Tex. R. App. P. 33.1(a)(1). In
parental rights termination cases, "a party who intends to request a new trial or appeal the order must
file with the trial court: (1) a request for a new trial; or (2) if an appeal is sought, a statement of the
point or points on which the party intends to appeal." Tex. Fam. Code Ann. § 263.405(b) (Vernon
2008). "The appellate court may not consider any issue that was not specifically presented to the
trial court in a timely filed statement of the points on which the party intends to appeal or in a
statement combined with a motion for new trial." Tex. Fam. Code Ann. § 263.405(i) (Vernon
2008). Even constitutional challenges can be waived by failure to object. Curry v. State, 910
S.W.2d 490, 496 (Tex. Crim. App. 1995). "Except for complaints involving systemic (or absolute)
requirements, or rights that are waivable only, . . . all other complaints, whether constitutional,
statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)." Mendez v. State, 138
S.W.3d 334, 342 (Tex. Crim. App. 2004). 

 Allison did not file a motion for new trial. Her statement of points discusses the alleged
unconstitutionality of Section 263.405 of the Texas Family Code, not Section 107.013. Therefore,
we find that Allison waived the first point of error. It is overruled. 

IV. Allison Was Not Deprived of Alleged Right to Timely Appointment of Counsel 

 Allison's next complaint can be fairly summarized as follows: "[t]he state must comply with
procedural due process requirements," "[t]he Texas Family Code requires appointment of an attorney
ad litem to represent indigent parents," "[d]enial of right to counsel in the criminal context is a
structural defect," structural defects "defy analysis by 'harmless error' standards," "[t]he trial court
waited too late . . . to appoint an attorney" and therefore, "[f]ailure to timely appoint an attorney
denied Allison the right to meaningful participation" because "[t]he attorney ad litem's performance
was so egregious that it constituted deprivation of the right to counsel." First, we note that although
Allison repeatedly refused the proffer of court-appointed counsel and had never filed the statutorily-required document which would authorize the trial court to appoint an attorney ad litem for her, she
was in fact appointed counsel. This leaves only the argument that counsel was appointed too late. 

 In a termination proceeding, a trial court has discretion not to appoint counsel until after a
parent has requested appointment. In re J.R.P., 55 S.W.3d 147, 150-51 (Tex. App.--Corpus Christi
2001, pet. denied); In re M.J.M.L., 31 S.W.3d 347, 355-56 (Tex. App.--San Antonio 2000, pet.
denied) (holding record devoid of evidence that parent was denied reasonable access to counsel
where he had only conferred with him for one and a half hours prior to trial). Section 107.013 of the
Texas Family Code states that "[a] parent who claims indigence . . . must file an affidavit of
indigence in accordance with Rule 145(b) of the Texas Rules of Civil Procedure before the court can
conduct a hearing to determine the parent's indigence under this section." Tex. Fam. Code Ann.
§ 107.013(d) (Vernon 2008). Because Allison failed to file an indigency affidavit (the act which
would trigger the process for mandatory appointment of an attorney ad litem for her), the trial court's
appointment of counsel can be described as generous. (3) We conclude that under the circumstances
here, the trial court did not abuse its discretion in waiting to appoint counsel until May 27, 2009. (4)
 

V. Allison Was Not Denied Right to Effective Assistance of Counsel 

 Allison alleges her attorney was ineffective because he (1) failed to file an answer; (2) did
not request a bench warrant to bring Allison to court for the trial; (3) did not interview potential
witnesses other than the grandmother; (4) failed to file a motion to withdraw; (5) made no request
for a continuance before trial on the merits; (6) cross-examined only three of the six witnesses;
(7) neither called any witnesses, nor presented any evidence on Allison's behalf; (8) did not object
to the introduction of T.K.A.'s autopsy report; and (9) misstated the burden of proof in closing
argument to the trial court. Although not raised in the statement of points, we consider Allison's
ineffective assistance of counsel claim. In re J.O.A., 283 S.W.3d 336, 339 (Tex. 2009) (Tex. Fam.
Code Ann. § 263.405(i) ruled unconstitutional to the extent that it prevents appellate consideration
of parent's ineffective assistance of counsel claim in the absence of inclusion of that claim among
points of error.).

 The "statutory right to counsel in parental-rights termination cases embodies the right to
effective counsel." In re M.S., 115 S.W.3d 534, 544 (Tex. 2003). The two-pronged analysis
employed in Strickland v. Washington, 466 U.S. 668, 687 (1984), is also used in termination cases. 
J.O.A., 283 S.W.3d at 341; M.S., 115 S.W.3d at 545. Both prongs of the Strickland test must be
established in order to establish ineffective assistance. M.S., 115 S.W.3d at 545. 

 First, Allison must show that counsel's deficient performance resulted in "errors so serious
that counsel was not functioning as the 'counsel' guaranteed" to her by the Sixth Amendment. Id. 
In analyzing this prong, we take into account all circumstances surrounding the case and primarily
focus on whether counsel performed in a reasonably effective manner. Id. We also "give great
deference to counsel's performance, indulging 'a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance,' including the possibility that counsel's
actions are strategic." Id. Only when counsel's conduct is "so outrageous that no competent attorney
would have engaged in it," will the challenged conduct constitute ineffective assistance. Id. Also,
allegations of ineffectiveness must be firmly founded in the record. Thompson v. State, 9 S.W.3d
808, 813 (Tex. Crim. App. 1999); In re T.N.F., 191 S.W.3d 329, 330 (Tex. App.--Waco 2006,
order). We will not speculate to find trial counsel ineffective when the record is silent on counsel's
reasoning or strategy. Robinson v. State, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000); In re
M.C.T., 250 S.W.3d 161, 172 (Tex. App.--Fort Worth 2008, no pet.). Where, as here, the record
is silent as to the reason that counsel failed to lodge certain objections or take certain actions, we
assume it was due to any strategic motivation that can be imagined and, in order to succeed in her
complaint, Allison is obligated to rebut the presumption that trial counsel's actions were in some
way reasonable. Mata v. State, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007). 

 Addressing this first Strickland prong, we dispose of several alleged points of ineffectiveness. 
First, since the matter was set for trial, and Allison had already appeared in the lawsuit, counsel
could have determined that no written answer was required. Had an answer been filed, it would not
alter the burden of DFPS to prove the allegations contained in its petition by clear and convincing
evidence or otherwise have provided any benefit to Allison she would otherwise not have had. Next,
we may assume, based on Allison's reported hostile behavior throughout the termination
proceedings, that counsel thought it best not to request a bench warrant simply to bring Allison
before the trial court; to have done so might well have made this demonstrated hostile attitude more
readily apparent to the trial court, thereby damaging Allison's case. Further, counsel's interview
with the maternal grandmother could have led him to decide that it would be useless to interview
other witnesses, or, after reviewing DFPS's files and speaking with Allison, there were no other
available witnesses who could testify in a manner that would improve her defense. 

 Counsel requested no continuance. Unless a court finds it is in the best interest of the
children to remain in the temporary managing conservatorship of DFPS, it must commence with trial
on the merits in a termination proceeding no later than "the first Monday after the first anniversary
of the date the court rendered a temporary order appointing the department as temporary managing
conservator." Tex. Fam. Code Ann. § 263.401(a) (Vernon 2008). If the court fails to comply with
this time line, it "shall dismiss the suit." Id. DFPS was appointed temporary managing conservator
on August 18, 2008. Trial on the merits commenced on June 22, 2009. With only a little over two
months left before expiration of the statutory deadline to dismiss the case, and nothing in the record
to indicate the trial court's docket would enable it to reschedule trial within the time frame, counsel
may have felt that requesting a continuance would be futile. See In re A.A., No. 05-07-01698-CV,
2008 WL 2514346, at *3 (Tex. App.--Dallas June 25, 2008, no pet.) (mem. op.). Importantly,
counsel's billing records indicate that he made preparation for trial; there is the possibility that he
was as ready to proceed with trial as he would be later if a continuance were requested and granted. 
Alternatively, because Allison refused assistance of counsel and insisted on representing herself, we
may assume this was the reason counsel did not request a continuance, a bench warrant, or conduct
discovery to Allison's liking. Allison does not explain why the failure of counsel to file a motion
to withdraw was deficient performance and we need not address the alleged ground of
ineffectiveness. 

 Additionally, Allison complains of trial counsel's failure to cross-examine T.J.A.'s foster
parent, K.L.L.H.'s foster parent, and the guardian ad litem for the children. It is possible that cross-examination may not have proven useful to Allison's defense and he may have deemed that a cross-examination would have served only to emphasize points damaging to Allison's case. Allison
complains that counsel did not call any witnesses or present any evidence in her defense, but fails
to identify any such witnesses or suggest any other evidence that may have been helpful. Again,
counsel could have decided that any potential witnesses could have caused more harm than good,
or that there was no evidence favoring Allison. "Appellant refused to cooperate with counsel and
did not want her representation; thus, she should not benefit from a reversal based on counsel's
actions at trial." In re R.S., No. 14-08-01013-CV, 2009 WL 3191515, at *5 (Tex. App.--Houston
[14th Dist.] Oct. 1, 2009, pet. denied) (mem. op.). Without citing authority supporting her position,
Allison complains that counsel should have objected to the properly certified autopsy report because
it "contained hearsay, the author of the autopsy was not present, and counsel had not read the report
or even seen it before that day." Allison fails to bring to this Court's attention any portion of the
report which contains hearsay. Further, counsel could have decided the autopsy report was more
helpful than harmful to Allison because it stated T.K.A. was well nourished, well developed, had no
fractures, and was otherwise inconclusive as to the cause of death. Finally, although counsel stated
DFPS's burden of proof was by a preponderance, rather than by clear and convincing evidence, the
comment was made during a bench trial to a judge who knew the burden of proof and there is no
indication that the trial judge was prompted to rely on a lesser burden than the law requires. We look
to counsel's performance as a whole, and find this isolated incident was not so serious that we must
find his performance deficient. 

 Even assuming alleged deficiency with respect to any of the grounds of ineffectiveness, under
the second prong of Strickland, Allison cannot demonstrate that counsel's performance caused harm
or otherwise prejudiced her such that it prevented a fair trial. M.S., 115 S.W.3d at 545. Counsel's
representation must be "so grossly deficient as to render proceedings fundamentally unfair." Id. In
other words, Allison had to show "there is a reasonable probability that, but for counsel's
unprofessional error(s), the result of the proceeding would have been different." Id. at 550. We
conduct the review "to determine harm as if . . . sufficiency had been preserved . . . understanding
that the evidentiary burden in such cases is 'clear and convincing.'" Id.; see Tex. Fam. Code Ann.
§ 161.001(1) (Vernon Supp. 2009). Clear and convincing evidence is "proof that will produce in
the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be
established." J.O.A., 283 S.W.3d at 344. 

 "The distinction between legal and factual sufficiency when the burden of proof is clear and
convincing evidence may be a fine one." In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). When
conducting a legal sufficiency review, and giving appropriate deference to the trial judge in this case,
we "look at all the evidence in the light most favorable to the finding to determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its finding was true." 
J.O.A., 283 S.W.3d at 344 (citing J.F.C., 96 S.W.3d at 266). We assume the trial court resolved
disputed facts in favor of its finding, and disregard evidence which could have been found to be
incredible. Id. "If, in light of the entire record, the disputed evidence that a reasonable fact finder
could not have credited in favor of the finding is so significant that a fact finder could not reasonably
have formed a firm belief or conviction, then the evidence is factually insufficient." Id. (citing
J.F.C., 96 S.W.3d at 267). 

 Here, DFPS had to prove by clear and convincing evidence that Allison: (1) "failed to
comply with the provisions of a court order that specifically established the actions necessary for the
parent to obtain the return of the child[ren]"; (2) "knowingly placed or knowingly allowed the
child[ren] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional
well-being"; or (3) constructively abandoned the children if they "ha[d] been in the permanent or
temporary managing conservatorship of [DFPS] . . . for not less than six months," even though DFPS
made reasonable efforts to return the children. Tex. Fam. Code Ann. § 161.001(1)(D), (N), (O). 
This occurred if Allison did not regularly visit them, or demonstrated an inability to provide them
with a safe environment. Id. 

 The evidence demonstrated that while Allison attended two parenting sessions, she failed to
pay child support for the children, undergo psychological evaluation, attend counseling and drug and
alcohol classes, or maintain stable employment as she had been ordered. The trial court could have
concluded that the DFPS had established clear and convincing evidence that Allison did not comply
with the court orders. Further, the record demonstrated that DFPS was temporary managing
conservator of the children for well over six months, that Allison visited the children only once prior
to her incarceration, and that she was unable to provide them with a safe environment. Thus,
constructive abandonment was also established by clear and convincing evidence. Finally, evidence
that Summer had gone to jail for injuring her son, that Danterio had hit K.L.L.H. with a belt, that
alcohol was in T.K.A.'s system when he passed away, that the children were not provided proper
medical treatment or care, did not have normal sleeping patterns, were developmentally challenged,
and did not maintain a proper diet could lead to an indication that Allison either "knowingly placed
or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed]
the[ir] physical or emotional well-being." Thus, Allison would not be able to meet the second
Strickland prong to prove that but for counsel's alleged error, the result of the trial would have been
different. Our ruling is bolstered by absence of any mention in Allison's brief of evidence which
counsel could have unearthed and presented to the trial court that would result in a different outcome
at trial. 

 We conclude that Allison cannot meet her burden to demonstrate she was provided
ineffective assistance under the Strickland test. Her last point of error is overruled. 

VI. Conclusion 

 We affirm the judgment of the trial court terminating Allison's parental rights to K.L.L.H.
and T.J.A.

 



 Bailey C. Moseley

 Justice


Date Submitted: December 16, 2009

Date Decided: January 12, 2010

1. The autopsy report states, "The laboratory did reveal non-lethal levels of Isopropanol and
acetone.  . . . the origin of the Isopropanol has not been determined. It most likely was a contributing
factor in the death of this child." 
2. An incident report said Allison's "friend and her baby, they were walking across the street,
[Allison] came out with . . . a steel pole and hit this friend; she just started swinging and hit her twice
in the left arm and once in the back of the head." As a result of the incident, Allison was
incarcerated for two years. 
3. A sister court has held that when a parent refuses appointed counsel and indicates intent to
hire an attorney, they are no longer considered indigent. See Thornton v. Tex. Dep't of Protective
& Regulatory Servs., No. 03-01-00317-CV, 2002 WL 246408, at *2 (Tex. App.--Austin Feb. 22,
2002, pet. denied) (not designated for publication). That case held that appointment of counsel less
than two months before trial did not violate the parent's right to counsel. See also M.J.M.L., 31
S.W.3d at 356 (no violation of due process rights from delay in appointing counsel where parent did
not request counsel). We do not address whether this appointment in the absence of the filing of an
indigency affidavit would be an ultra vires act. 
4. Allison also cited caselaw pertaining to the Federal Constitution in her brief. We note that
the Federal Constitution does not require that counsel be appointed for all indigents faced with
termination of their parental rights. Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27-32 (1981). 
Rather, the trial court must weigh the parent's interests, the State's interests, and the risk of an
erroneous decision without counsel. Id.